# Supreme Court of Kentucky

2018-SC-0667-MR

SHAYNA HUBERS                                                                    APPELLANT

ON APPEAL FROM CAMPBELL CIRCUIT COURT
V.                        HONORABLE DANIEL J. ZALLA, JUDGE
                                    NO. 12-CR-00954

COMMONWEALTH OF KENTUCKY                                          APPELLEE

## ORDER

The Court hereby orders that the Opinion of the Court rendered on September 24, 2020, be MODIFIED, and the attached opinion is hereby ORDERED SUBSTITUTED for the opinion originally rendered. Additionally, Appellant's Petition for Rehearing is denied.

All sitting. All concur.

ENTERED: FEBRUARY 18, 2021

_____
CHIEF JUSTICE

1

MODIFIED: FEBRUARY 18, 2021
RENDERED:  SEPTEMBER 24, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-0667-MR

SHAYNA HUBERS                                                APPELLANT


                  ON APPEAL FROM CAMPBELL CIRCUIT COURT
V.                        HONORABLE DANIEL J. ZALLA, JUDGE
                              NO. 12-CR-00954


COMMONWEALTH OF KENTUCKY                          APPELLEE


**OPINION OF THE COURT BY JUSTICE HUGHES**

**<u>AFFIRMING</u>**

On April 15, 2015, a Campbell County jury convicted Shayna Hubers of the murder of her boyfriend, Ryan Poston.  After discovering that a convicted felon served on the jury, Hubers moved for a new trial and the Campbell Circuit Court granted her motion.  Her sixteen-day retrial in August 2018 once again ended with Hubers's conviction.  The trial court sentenced her to life imprisonment in accordance with the jury's recommendation.  Hubers now appeals as a matter of right, raising issues concerning jury selection, her motion to change venue due to pretrial publicity, and the admissibility of various items of evidence.  After careful review, we affirm the trial court.

2

## FACTS AND PROCEDURAL HISTORY

On October 12, 2012, Shayna Hubers called Emergency Medical Services (EMS) and told the dispatcher that she shot her boyfriend, Ryan Poston, in self-defense. According to Hubers, Poston had beaten her and was reaching for a gun. During the call she stated that she "shot him a couple more times just to kill him . . . because he was twitching and [she] knew he was going to die anyway and he was making funny noises." Hubers also told the dispatcher that she waited approximately fifteen minutes before calling EMS. The evidence subsequently revealed that she shot Poston a total of six times in his Highland Heights condominium.

As noted, Hubers was originally convicted in April 2015 and sentenced to forty years in prison but the trial court granted her a new trial when it was discovered that a convicted felon had served on the jury. The sixteen-day retrial began on August 8, 2018. After several days of both general and individual *voir dire,* the jury was seated on August 13, 2018. Specific facts regarding individual jurors that Hubers challenged for cause and the pretrial publicity surrounding the case are discussed *infra* in the context of her arguments.

The Commonwealth's proof at trial included a video recording of Hubers's interview with police shortly after the shooting. Initially, Hubers requested an attorney, but, unprompted by police, she subsequently spoke at length about the incident in an interview that lasted approximately three hours. In the video, Hubers can be seen dancing around the room and singing at times. She

3

claimed that Poston was "whacked on drugs" and abusive towards her. Prior to the shooting, according to Hubers, he was "throwing [her] around the room like a ragdoll," including against the furniture, onto the floor and into the television. After he threw her around, he sat at the dining table and screamed at her, yelling insults and saying he hated her. Several times she mentioned that she shot Poston in self-defense. She also described Poston as "evil" and said he "deserved it."

According to Hubers, after she shot Poston he fell to the floor and was twitching and making strange noises, so she shot him a few more times to kill him because she "knew he was going to die or have a completely deformed face." She told officers that Poston was very vain and wanted rhinoplasty so by shooting him in the face, she "gave him the nose job he always wanted." Despite her claims of abuse, an officer who examined her at the police station did not find any injuries, other than a bit of discoloration on her shin.

The Commonwealth's theory of the case was that Hubers, a graduate student living in Lexington, shot Poston, a twenty-nine-year old lawyer who practiced in Cincinnati, because he was ending their eighteen-month relationship. Learning that Poston planned to go on a date with another woman that very night contributed to her decision to shoot him.

Chief Bill Birkenhauer[1] of the City of Highland Heights Police Department investigated the case and later testified that the crime scene

---

[1] During the initial stages of the investigation, Birkenhauer was a Detective Lieutenant but at some point before the retrial he became Chief of the department.

4

contradicted Hubers's version of events. Although she alleged Poston threw her into the television, Birkenhauer found the television was in place and very dusty, suggesting no one had come in contact with it. Items on Poston's dining table were undisturbed, contradicting her statement that he had been reaching across the table for the gun. While Poston's condominium was somewhat in disarray, his father, who visited the condominium frequently, testified that Poston was a "bit of a slob." According to Chief Birkenhauer, the scene did not reflect any type of a struggle.

At the time of the shooting, Vernon and Doris West lived in the condominium directly below Poston's residence. The Wests testified at Hubers's first trial in 2015. Over Hubers's objection, in 2018 the trial court declared Doris West unavailable by reason of mental infirmity pursuant to Kentucky Rule of Evidence (KRE) 804(a)(4) and allowed the Commonwealth to play the video of Doris's testimony from the first trial. Doris said on the night of the murder she heard two shots, then approximately six seconds later she heard four more shots. She did not hear anyone screaming or yelling prior to hearing the shots. Vernon West testified live at the 2018 trial and stated that he heard two shots, the sound of a person falling, then four more shots. He also did not hear any yelling, thumping or moving around upstairs prior to hearing the shots.

Much of the trial testimony revolved around Hubers and Poston's tumultuous relationship. Their relationship began in March 2011 when Poston requested to connect with Hubers on Facebook. They met in person for the

5

first time in April 2011. Until November 2011, the pair saw each other occasionally and texted frequently, although Hubers sent substantially more text messages to Poston than he sent to her. After November 2011, the couple had multiple break-ups which often lasted for a short period of time. In April 2012, Hubers confronted him about degrading things he apparently said about her to other people. According to Hubers, they had an altercation and Poston picked her up and threw her on the doorstep of his condominium. She also testified that he beat her body repeatedly with the door as she tried to collect her belongings and leave.

There was a break in the parties' relationship between April and July 2012. When they resumed seeing each other in July, Hubers claimed that Poston placed "conditions" on their relationship, such as requiring her to speak less, to have a hobby while at his condominium, and to participate in sexual acts with him and other women. According to Hubers, Poston degraded her when there were in public together, often commenting on her eating habits and making fun of her.

The Commonwealth introduced the testimony of one of Hubers's friends who recalled text messages she received from Hubers regarding Poston. In one message, sent eleven days before the shooting, Hubers said "When I go to the shooting range with [Poston] tonight, I want to turn around, shoot and kill him, and play like it's an accident." In referencing their shooting range trip to another friend, Hubers said "a part of [her] wanted to turn around and shoot him[.]" Other messages said things like her "love has turned to hate," and "I

6

hate him." She also sent a message to a friend, a practicing dentist, which said "[Poston's] been begging me to ask you if you could do his veneers, but please 'F' them up and make him ugly so he'll never get another girl. I hate him." Multiple witnesses described Hubers and Poston's relationship as "on again, off again" and tumultuous.

One of Poston's friends testified that he met with Poston shortly before his death. Poston told him he intended to break up with Hubers face-to-face soon, because the other ways in which he tried to end their relationship, like giving hints or sending text messages, had not worked. Poston's friend believed that Poston intended to break up with Hubers the day he was murdered. Additionally, one of Poston's co-workers who worked as a receptionist in his building testified that approximately two weeks before his death Poston walked into the building and seemed sad. When she asked him what was wrong, he asked her "How do you break up with someone that doesn't want to break up with you?" Poston also asked her opinion of men who needed to apply for restraining orders. She further testified that the day he died he came into the building with a smile on his face and was upbeat. He told her that he had a date with a new girl, so the co-worker asked him if he had ended the relationship with Hubers. Poston said they had broken up and he planned to tell Hubers he had a date.

Three women who were incarcerated with Hubers also testified at the 2018 trial – Donna Dooley, Holly Nivens, and Cicely Miller. Donna Dooley testified that Hubers described the murder to her and said before the shooting

she threw things around the condominium to be loud and make it appear that Poston was abusing her. Hubers told Dooley that she shot Poston because he wanted her to leave so he could go on a date. Dooley testified that she remembered the conversation because Hubers "had no remorse at all."

According to Holly Nivens, Hubers discussed the case with her and said Poston physically abused her on the night of the shooting. After some time, Hubers admitted that she was the aggressor and that Poston had not abused her. She told Nivens she shot Poston because he was breaking up with her and gave details about that night. Hubers told Nivens that Poston locked himself in the bedroom, apparently to avoid confrontation, but Hubers entered his room by picking the lock with a bobby pin.[2] Nivens testified that Hubers told her that on other occasions she would throw things around the condominium to convince neighbors that she and Poston were fighting. Additionally, Hubers told Nivens that she would show self-inflicted bruises on her arms to residents in Poston's building to make them believe he was abusive. Although Hubers would pretend to cry on the phone while incarcerated, she would smile and wink at her fellow inmates.

A third inmate, Cicely Miller, testified that Hubers often laughed when talking about Poston's death. Hubers told Miller that she knew Poston was supposed to go on a date with Miss Ohio (Audrey Bolte) that night, and she

---

[2] Hubers's internet search history revealed that on the night of the shooting she searched for how to unlock a door with a bobby pin. She testified at trial that she used a small key used to open locked doors that was stored in the condominium in order to gain access to the bedroom to retrieve her purse and keys to leave.

8

killed him after he asked her to leave. Hubers stated that she intended to claim Poston had beaten and raped her, even though it was untrue. Like Dooley, Miller said Hubers did not appear to have any remorse.

Testifying in her own defense, Hubers admitted exhibiting possessive and controlling behaviors during her relationship with Poston.[3] She admitted that if Poston tried to break up with her, she would send him countless text messages and then continue sending messages even when he did not respond. Hubers went to Poston's condominium uninvited and entered when he was not there because she had a key. She admitted to searching Poston's phone because she did not trust him, accessing his Facebook page to "block" other women, and contacting his neighbors to see if he was home when she was not in the area. Additionally, she acknowledged lying to Poston about her dating other men. In a message to Poston in May 2012, Hubers referenced obtaining an out-of-state phone number that she used to contact Poston because she knew he would not speak to her if she "made [her]self known." On October 1, 2012, she used a friend's cell phone to text Poston pretending to be a potential client of his law firm and insulted him repeatedly. During one of their break-ups, she faked a heart condition to gain his empathy.

As to October 12, 2012, Hubers testified that when she went to Poston's condominium that evening she asked him about his day and he seemed angry.

---

[3] Mental health experts testifying for both the Commonwealth and the defense diagnosed Hubers with borderline personality disorder, with the defense expert also concluding that she suffered from post-traumatic stress disorder stemming from childhood.

9

He called her names and made other disparaging remarks, criticized her appearance and family, and called her "crazy and unstable." According to Hubers, Poston's eyes were normally blue but that night they "were completely black." When she tried to get into the bedroom to retrieve her things and leave, he grabbed her with both hands, picked her up by her bra and pants and threw her into another room. According to her, at some point, Poston fell on top of her with all his body weight and had his hand in her hair. He was jerking her around and she thought he was going to snap her neck. He was screaming at her and yelling insults. She got out from under him and they continued to wrestle standing up while he continued to scream at her.

Hubers testified that she lost her recollection about what happened next but remembers sitting near the dining table with Poston over top of her. She was crying hysterically and when she tried to stand up, he pushed her back down. Then Poston grabbed the gun, pointed it at her, and told her that he could kill her and get away with it. She testified that she was shocked and afraid. He put the gun down and walked back around the table while still saying hurtful things to Hubers. He sat down briefly and began to stand back up while reaching across the table. She was not sure whether he was reaching for her or the gun, so she got up off the floor, grabbed the gun and shot him. After the first shots, he let out a loud noise that sounded like an animal. It "freaked" her "out."[4] She searched the apartment for her phone and it took her

_____

[4] It is unclear how many shots Hubers fired first and how many she fired after pausing. There was testimony that suggested she shot him once in the head, then fired five more shots. A forensics expert testified that Hubers shot Poston three times

10

a while to find it. She first called her mother and told her what happened before calling 911.

The jury rejected Hubers's claim of self-defense, finding her guilty of murder.[5] Following the penalty phase, the trial court sentenced her to life imprisonment in accordance with the jury's recommendation.[6]

## **ANALYSIS**

On appeal, Hubers alleges that the trial court erred (1) by refusing to strike six jurors for cause; (2) by refusing to grant a change of venue; (3) by improperly admitting evidence of Hubers's lack of remorse; (4) by disallowing two defense exhibits; (5) by excluding text and Facebook messages from Poston regarding his drug use; (6) by allowing victim impact evidence during the guilt phase; (7) by permitting the testimony of Audrey Bolte; and (8) by declaring Doris West unavailable and allowing her videotaped testimony. Finally, Hubers alleges cumulative error. For the reasons discussed below, we find no reversible error.

---

while he was sitting, then three more times. The expert also testified that four of Poston's six gunshot wounds had stippling, indicating that the gun had been fewer than three feet away from him when the shots were fired.

[5] The trial court gave the jury instructions on murder, first-degree manslaughter, second-degree manslaughter and reckless homicide.

[6] The trial court sentenced Hubers on December 4, 2018 and this appeal followed but it was not submitted to the Court until after the filing of Hubers's reply brief on February 27, 2020.

11

## I. The trial court did not err by refusing to remove six jurors for cause.

Hubers moved to strike the following six jurors for cause: Jurors 499, 427, 302, 261, 330, and 173. She claims that all six jurors were biased because they were exposed to pretrial publicity or professed an inability to follow the court's instructions. Additionally, one of the jurors stated that she would "think about" Hubers's decision if she chose not to testify.[7] The trial court denied the motions to strike, and Hubers, having used peremptory challenges on all six jurors and identified six jurors she otherwise would have struck, now argues that the trial court erred in refusing to strike these jurors for cause.[8]

In determining whether a juror must be stricken for cause, the trial court must employ the standard in Kentucky Rule of Criminal Procedure (RCr) 9.36(1), which states that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." "[R]egardless of the juror's actual ability to render a fair and impartial verdict, Rule 9.36(1) mandates the removal

---

[7] As noted, Hubers did in fact testify at trial.

[8] Hubers also presents information about three jurors who were allegedly involved in an improper conversation about her prior to the jury being seated. During a break, two jurors were outside the courthouse smoking. Juror 265 heard Juror 700 tell Juror 85 that Hubers "is a murderous bitch, she did this in cold blood and she has the audacity to walk around the court room smiling." When questioned by the trial court, Juror 700 stated that he did not make that statement, and Juror 85 did not recall Juror 700 making that comment. The two said they did not talk about Hubers or the case while smoking. The trial court removed all three jurors for cause. Hubers states that she moved for a mistrial, but the trial court denied the motion because all three jurors were removed. Hubers's brief contains no argument pertaining to these jurors, and accordingly we decline to address the alleged conversation.

of a juror if there is merely 'a reasonable ground to believe' that he cannot render a fair and impartial verdict." *Sturgeon v. Commonwealth,* 521 S.W.3d 189, 194 (Ky. 2017). The exclusion of a juror for cause is within a trial court's discretion and "on appellate review, we will not reverse the trial court's determination unless the action of the trial court is an abuse of discretion or is clearly erroneous." *Hilton v. Commonwealth,* 539 S.W.3d 1, 11 (Ky. 2018) (citations omitted). "The central inquiry is whether a prospective juror can conform his or her views to the requirements of the law, and render a fair and impartial verdict based solely on the evidence presented at trial." *Wood v. Commonwealth,* 178 S.W.3d 500, 516 (Ky. 2005). Hubers complains about these jurors because of their knowledge of the first trial and her prior conviction in 2015, their exposure to media and pretrial publicity, or their seeming inability to follow the trial court's instructions.

All of the jurors who knew about Hubers's conviction in the first trial or minimal facts about the case learned that information from the media. Generally,

> [t]here is no per se rule that mere exposure to media reports about a case merits exclusion of a juror. To the contrary, in order to merit disqualification of a juror, the media reports must engender a predisposition or bias that cannot be put aside, requiring the juror to decide a case one way or the other . . . . There is no constitutional prohibition against jurors . . . having knowledge of the case. The Constitution does not require ignorant or uninformed jurors; it requires impartial jurors. While it may be sound trial strategy for an attorney to exclude anyone with knowledge of the facts or the parties, such a result is not mandated by the Constitution.

13

*Hodge v. Commonwealth*, 17 S.W.3d 824, 838 (Ky. 2000) (quoting *McQueen v. Scroggy*, 99 F.3d 1302, 1319-20 (6th Cir. 1996)). Thus, while a juror's prior knowledge of the case can constitute proper grounds to strike the juror for cause, the disqualification is not automatic.

### A. The trial court did not abuse its discretion in refusing to strike jurors with knowledge of Hubers's prior trial or conviction.

Prior to the retrial, the trial court denied Hubers's motion for a change of venue based on pretrial publicity surrounding the case. However, the trial court granted her requests for individual *voir dire* and a jury questionnaire[9] mailed to all jurors prior to trial. As the court's order stated, the jointly-drafted questionnaire was intended to "allow the Court and the parties to evaluate a potential juror's knowledge of pretrial publicity and opinions about this case and reduce the risk that such knowledge and opinions would taint the entire jury pool if orally expressed by an individual juror in open court." Based on responses to the questionnaire, the Commonwealth and Hubers submitted an August 2, 2018 "Joint Status Report to Identify Jurors to Excuse" in which they agreed to a list of sixty-one jurors[10] (identified solely by their juror numbers) who should be excused for cause. All sixty-one were excused prior to *voir dire*. Hubers argues that the trial court's decision to closely examine

---

[9] Each juror received a packet consisting of a two-page letter, a three-page questionnaire regarding pretrial publicity and knowledge of the case, and an extra lined-page if the juror needed more space to explain an answer.

[10] The submitted report contained sixty-three jurors to be excused for cause. However, one of the jurors listed was previously excused. Another juror listed was never in the jury pool. Therefore, although the list contained sixty-three jurors, only sixty-one were actually excused for cause pursuant to the report.

14

jurors' exposure to media coverage of the case carried with it the commitment to excuse all potential jurors affected by any pretrial publicity.

On August 8, 2018 the trial began with individual *voir dire* of the remaining eighty-two potential jurors. The individual *voir dire* was limited to additional questions regarding pretrial publicity and the degree of knowledge each potential juror had about the case. Of those eighty-two jurors, seventeen jurors were struck for cause, leaving sixty-five potential jurors in the panel.

As this Court has noted, "prospective jurors do not live in a vacuum and cannot be expected to be totally ignorant of any case they may be called upon to decide." *Foley v. Commonwealth*, 953 S.W.2d 924, 932 (Ky. 1997). The retrial of a case, as occurred here, can make it particularly difficult to find jurors who know nothing about the matter. However, the law does not require that a juror completely lack knowledge about a case prior to serving. As the United States Supreme Court has held, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

In *Brown v. Commonwealth*, 313 S.W.3d 577, 587 (Ky. 2010), the defendant was tried and convicted of robbery, burglary and murder. After this Court reversed Brown's conviction because his Sixth Amendment right to cross-examine certain key witnesses was improperly limited, he was retried for the same crimes. *Id.* at 588. The Commonwealth played a video of Brown's testimony from his first trial and he was ultimately convicted for the second time. *Id.* at 588-89.

15

On appeal, Brown argued that his recorded testimony from the first trial should have been "sanitized of all reference to the fact that [he] had been tried before." *Id.* at 606. This Court held that so long as a jury is not expressly informed during trial that another jury previously found the defendant guilty of the present charges, "the fact that the jury may have been aware that Brown was being retried no more infringed upon his right to be presumed innocent than does the jury's awareness that the defendant was arrested, indicted, and put on trial." *Id.* at 607 (citations omitted). The Court reasoned that

> [e]ven had the express references to the jury been redacted from Brown's recorded testimony, moreover, the second jury was sure to have realized that he had been tried previously from his appearing on the witness stand and from the nature of the questions put to him. *Any consequence so inherently a part of the criminal process, even if some element of prejudice attaches to it, cannot provide grounds for relief because the prejudice cannot be deemed unfair or unreasonable.*

*Id.* (Emphasis added). "[W]hen a defendant succeeds in having his conviction overturned and his case retried, it is very likely, if not inevitable, that the fact of retrial will in some way be brought to the jury's attention." *Id.*

Although *Brown* addressed whether prior trial testimony played for a jury during retrial should be "sanitized" of references to the prior trial, this Court's conclusion regarding the inherent prejudice in jurors knowing a defendant has been tried before is applicable to Hubers's case. Hubers succeeded in securing a new trial, making it very likely that the fact of retrial would be brought to the jury's attention in some way. While some of the jurors also had pretrial knowledge of her prior conviction due to media coverage, this knowledge is not

16

necessarily any more prejudicial than knowing she was charged and put on trial.

"During the jury selection process, the trial court is . . . invested with discretion to determine, based upon the totality of the circumstances, whether extra-judicial information has infringed upon a prospective juror's mental attitude of appropriate indifference." *Gould v. Charlton Co., Inc.,* 929 S.W.2d 734, 739 (Ky. 1996). Mere exposure to information about a case is not enough to constitute implied bias. *Cook v. Commonwealth*, 129 S.W.3d 351, 357 (Ky. 2004). "[I]t must be shown that the exposure actually biased the juror[,]" *id.*, **or created a reason to believe the juror cannot render a fair and impartial verdict. RCr 9.36(1); *see Sturgeon*, 521 S.W3d at 194.** Even a prospective juror's knowledge that the defendant standing trial was convicted of the same offense in a prior trial need not always result in an excusal for cause because the juror's knowledge does not automatically equate to bias, **or a reason to believe the juror cannot render a fair and impartial verdict.** While this Court has not directly addressed that particular issue before, courts in other jurisdictions have and have concluded that the juror's knowledge of the prior conviction is not per se disqualifying. *See, e.g., State v. Fraga*, 864 N.W.2d 615, 623 (Minn. 2015) (jurors in a retrial case that know the first trial ended in conviction are not "impliedly biased as a matter of law."); *Bush v. State*, 695 So.2d 70, 107-08 (Ala. Crim. App. 1995), *aff'd sub nom. Ex parte Bush*, 695 So.2d 138 (Ala. 1997) (prospective jurors who have knowledge of a defendant's

17

previous conviction for the same crimes do not need to be automatically excused from the jury panel).

We believe that most jurors can set aside their secondhand, pretrial knowledge of the prior conviction, especially when, as here, the potential jurors are subject to rigorous individual examination and swear under oath that they will do so. While there may be circumstances in which a potential juror's knowledge of the defendant's prior conviction for the same crime results in actual bias **or reasons to believe the juror cannot render a fair and impartial verdict**, those circumstances **or reasons** are not present in this case.

We reiterate that the trial court is vested with broad discretion to determine the prejudicial effect of "extra-judicial information." *Gould,* 929 S.W.2d at 740. Moreover, a trial court must decide whether to strike a juror for cause based on "the totality of the circumstances, not on a response to any one question." *Fugett v. Commonwealth,* 250 S.W.3d 604, 613 (Ky. 2008). With these parameters in mind, we discuss each challenged juror in turn, providing detail regarding their questioning to give context to our analysis.

### i. Juror 499

Juror 499 had heard that Hubers killed someone she was in a relationship with and that the victim was a lawyer. He knew that Hubers was from either Lexington or Louisville and had gotten married while incarcerated. He was also aware that Hubers was found guilty during the first trial and that she was being retried because a juror had not known he had a felony

18

conviction. Juror 499 initially made a statement regarding his knowledge that caused some concern. When the Commonwealth asked him how knowing Hubers was previously convicted would impact him, he said he assumed he would hear the same evidence that the first jury heard but he would be open-minded to "a certain extent." The Commonwealth explained that it was actually a different trial with different evidence from both parties, then asked whether the knowledge of the prior guilty verdict would impact his decision or be in his mind. Juror 499 immediately said "no" and explained that he did not know what evidence the prior jury heard, only the outcome of the trial.

Further questioning revealed that Juror 499's girlfriend had sent him a text message saying they were selecting the jury for Hubers's case. She also told him she had seen a *Dateline* episode about the case, but he asked her not to tell him about it and she did not. He acknowledged that he probably would not want someone who knew about a prior trial and conviction if he were in Hubers's position but did not feel it would hold that much weight. He stated that if he were in Hubers's position, he would want someone to be open-minded and would want a fair trial.

Defense counsel asked whether "the fact that a prior jury had found [Hubers] guilty would make it easier for you to find her guilty" if the decision was a "close call." He said, "I'd assume . . ." then hesitated and said "I've never been in this situation." He seemed unsure about his response. The trial court reminded him that there is no right or wrong answer, and that they were only

concerned with his knowledge and whether he could be fair and impartial.

When defense counsel asked the juror the same question, he said:

> I'd like to think I'd review the . . . whatever was presented before me and make a decision. I don't necessarily know if what I heard on the news is gonna sway me, but it might be in the back of my mind, but I would also take into major account of what was told to me in the course of the trial.

Defense counsel continued this line of questioning:

> Defense counsel: You said, "I'd like to think." Like to think. In all fairness, can you . . . can you really tell us that that wouldn't impact you at all in any way that you knew that a prior jury had found her guilty?
> Juror 499: No, it wouldn't impact me.
> Defense counsel: It wouldn't impact you at all?
> Juror 499: No.

Even though Juror 499 did not hesitate in stating it would not impact him, defense counsel continued, "Is it fair to say that you would want to try to ignore what you know, but you don't know if you could?" Juror 499 responded, "I know very little," and stated he would like to try to ignore the little information he already knows. He again stated he could put his knowledge out of his mind. After defense counsel asked the juror whether he believed Hubers was "more probably guilty than not," he responded with "I'd have to be told what happened and all that. I don't know if it would impact me. I don't believe it would."

The trial court asked how the juror would "put the prior knowledge of the verdict out of [his] mind during deliberations," and he said he "would focus on what was presented to [him] instead of thinking about something [he] heard in passing in the past." When the trial court continued inquiring about how

20

Juror 499 would consider the prior conviction in making his decision, he insisted he would not think about it. The following dialogue took place regarding what percentage weight Juror 499 would give the prior verdict in rendering a decision:

> Trial court: What percentage would you allocate of this hundred percent?
> Juror 499: To the prior?
> Trial court: Yes.
> Juror 499: Zero.
> Trial court: Zero?
> Juror 499: Yeah.

Finally, the trial court asked whether he could set aside his knowledge from the media, including his knowledge of the prior verdict, and decide the case fairly and impartially based on the evidence and the court's instructions. He said he "wouldn't have a problem with that."

The trial court denied Hubers's motion to strike Juror 499 for cause, noting that he stated under oath that he would not consider the prior verdict. Any initial equivocation on the part of the juror, in the court's view, was likely the result of defense counsel's leading questions and his own unfamiliarity with the justice system. Notably, Juror 499 requested that defense counsel put one question in "layman's term[s]" and he also stated he had never been in this situation, *i.e.*, jury selection, before and did not have a law degree.

Pressing this allegation of error, Hubers cites *Ordway v. Commonwealth*, 391 S.W.3d 762, 781 (Ky. 2013) and argues that "[w]hen there is uncertainty about whether a prospective juror should be stricken for cause, the prospective juror should be stricken. The trial court should err on the side of caution by

21

striking the doubtful juror; that is, if a juror falls within a gray area, [he] should be stricken." While Juror 499 did provide some responses that were equivocal, *e.g.*, saying his knowledge of the prior conviction would not impact him, but also that it might be in the back of his mind, the clear majority of his responses indicated that he could disregard his prior knowledge, listen to the evidence presented and be a fair and impartial juror. Even if Juror 499 could be deemed a close call, the trial court is afforded great deference in evaluating a juror's ability to be fair and impartial because ". . . the trial court is in the best position to evaluate a juror's demeanor and answers during *voir dire."* *Hayes v. Commonwealth,* 320 S.W.3d 93 (Ky. 2010). As we have noted,

> it is the trial court's difficult task to distinguish between potential jurors whose equivocation reflects merely careful thinking and a strong sense of responsibility in the face of such an important decision and those jurors whose equivocation signals an impaired ability to abide by the jury instructions . . . . Because this distinction will often be anything but clear and will hinge to a large extent on the trial court's estimate of the potential juror's demeanor, the decision is one particularly within the trial court's discretion and is subject to reversal on appeal only for an abuse thereof.

*Brown,* 313 S.W.3d at 599. The trial court was satisfied that Juror 499 could put his knowledge aside and be a fair and impartial juror. Under our precedent, this determination deserves considerable weight.

In *Whittle v. Commonwealth,* 352 S.W.3d 898, 901 (Ky. 2011), a potential juror said he could be impartial but then agreed in response to a follow-up question that "there was a possibility bias might creep in" as a result of his friendship with a state trooper. This Court observed:

22

> A juror's response to one question, even if it may on its own indicate bias, does not necessarily outweigh the remaining indicia of neutrality. The question, therefore, is whether, given the totality of voir dire, the trial court properly exercised its discretion in finding no probability of bias.

*Id.* (citations omitted). This Court concluded that "[a] mere possibility of bias does not necessitate striking a juror for cause. The question for the court then became whether this possibility rose to the level of probability." *Id.*

Some of Juror 499's responses are like the juror's in *Whittle.* Early on in the questioning Juror 499 said he would try to ignore what he knows, was unsure whether knowledge of the prior conviction would impact him, and what he heard on the news might be in the back of his mind. But as *voir dire* progressed, Juror 499's responses became more concrete and reflected that he could be a fair and impartial juror. Ultimately, he indicated he would not think about the prior verdict in rendering his decision, would allocate the prior verdict 0% weight in deliberations, and would not hesitate to base his decision on the evidence presented and the court's instructions. As the Commonwealth suggests, any equivocation could have been the result of his inexperience with the justice system. Again, Juror 499 specifically mentioned that he had "never been in this situation before," "did not have a law degree," and once asked defense counsel to put his question into "layman's terms." One of his equivocal responses, that he would "assume" knowledge of Hubers's conviction would affect his decision if the case was a close call, came immediately after a somewhat confusing hypothetical posed by defense counsel.

23

Both parties and the trial court questioned Juror 499 at length, for approximately twenty minutes, and under oath about potential biases and his prior knowledge. Although he wavered a few times, he stated repeatedly and firmly that he could put the prior conviction out of his mind. Further, after two of his equivocal answers, defense counsel asked a follow-up question and Juror 499, without hesitation, insisted that he could set aside his knowledge of the prior conviction. Considering the totality of Juror 499's responses, he clearly demonstrated the ability to put his knowledge of the prior conviction out of his mind, render a fair and impartial decision, and follow the instructions of the court. With no "reasonable ground to believe" Juror 499 could not render a fair and impartial verdict, *Sturgeon*, 521 S.W.3d at 194, the trial court did not abuse its discretion in denying Hubers's motion to strike him for cause.

### ii. Juror 427

Several employees at Juror 427's workplace knew he was called for jury duty. After one co-worker asked him whether he was called in for the Hubers retrial, Juror 427 told him he had no idea "what it was about." Juror 427 admitted that after the conversation he searched "Campbell County Court retrial" on Google™. The "results" page included a WCPO[11] article and contained a "very short" blurb stating that there was a retrial because at the previous trial a juror did not disclose a felony conviction. Juror 427 knew that jury selection was beginning that day but knew nothing else about the facts of

---

[11] WCPO is a local news station that covers the Cincinnati, Northern Kentucky, and Southeast Indiana area.

the case or anything that happened in October 2012. He did not click on any of the search results. The blurb he read from WCPO was the only piece of information he could recall ever seeing or reading about the case. He also said that his co-worker did not mention any names or tell him anything about the first trial.

While Juror 427 knew the reason for the retrial, he did not know the outcome of the first trial or any of the facts of the case. He admitted that he "didn't really pay attention to the letter" included with the jury questionnaire, which instructed potential jurors not to research the case. Juror 427 affirmatively stated that he could set aside the little information learned from reading the internet blurb and be a fair and impartial juror. He said he would only listen to the evidence presented and the trial court's instructions. Additionally, he informed the trial court that he had not formed any opinions about the case and did not recognize anyone in the room, including Hubers.

Hubers moved to strike Juror 427 because he "could not follow directions," noting the letter to jurors clearly stated not to research the case. The Commonwealth responded that Juror 427 made it clear that the only thing he learned was that the case was a retrial. The trial court denied the motion, finding that Juror 427 would be fair and impartial. Additionally, the trial court emphasized that Juror 427 stated he had no idea why he was coming to court that morning.

In *Haight v. Commonwealth*, 938 S.W.2d 243, 245 (Ky. 1996), a prospective juror, in the third trial for the same crimes, read a news article

25

concerning the case before reporting for jury duty.  The juror testified that he scanned the article but did not remember the headline which stated the defendant had previously been sentenced to death.  *Id.*  The juror only remembered that there were two murders and robberies, and the victims' names.  *Id.*  This Court affirmed the trial court's view as to the juror's candor and impartiality and ultimately found no error.  *Id.* at 246.

Here, the only knowledge Juror 427 had was that the case was a retrial. The juror did not know anything about the facts of the case including the conviction resulting from the first trial.  Both parties and the trial court asked Juror 427 numerous questions to ascertain what knowledge he possessed and his ability to be fair and impartial.  Juror 427 affirmed that he could set aside the very little information he knew and be a fair and impartial juror, only listening to the evidence presented at trial and the court's instructions.  No reasonable grounds existed for believing that Juror 427 could not render a fair and impartial verdict.

Hubers highlights the fact that the letter sent to potential jurors specifically stated not to research the case, yet Juror 427 "Googled" the case. Juror 427 candidly admitted that he did not pay much attention to the letter he received because he primarily focused on the questionnaire.  In our view, the brief internet search he conducted was not a blatant disregard of the court's instructions, but rather the result of his inattention to the letter and, most importantly, it led to Juror 427 knowing nothing more than that the case was a retrial.  "The true test is whether the misconduct has prejudiced the

26

defendant to the extent that he has not received a fair trial." *Haight,* 938 S.W.2d at 246 (citing *Byrd v. Commonwealth,* 825 S.W.2d 272 (Ky. 1992), *overruled on other grounds by Shadowen v. Commonwealth,* 82 S.W.3d 896 (Ky. 2002)). While Juror 427's Google™ search violated the instructions in the letter, it did not prejudice Hubers or result in an unfair trial. The trial court did not err in denying Hubers's motion.

### iii. Juror 302

Juror 302 was an attorney who was generally unfamiliar with the case. She did know, however, that Hubers shot and killed Poston in the Highland Heights area and that the pair had been dating. Although she knew the reason behind the retrial, she did not know when it was discovered that a juror in that trial had a prior felony conviction. She thought the outcome of the first trial may have been a conviction but was unsure. Knowing it was a retrial would not impact her opinion whatsoever, and she had never formed an opinion as to Hubers's guilt or innocence.

Juror 302 expressed at one point her recognition of the importance of honesty during the jury selection process. She also noted that "it's everyone's job to make their own independent determinations based on the facts as provided to them, so . . . the fact that twelve other people . . . came up with a certain conclusion . . . wouldn't sway [her] opinion one way or the other." She stated she would not give any weight to what the prior jury did, and it would not make her think Hubers was more likely guilty.

27

Under careful questioning, Juror 302 reiterated that she had not formed an opinion about Hubers's guilt and expressed skepticism about the accuracy of information provided by the media, noting that she takes things she hears from the press "with a grain of salt." Further, she expressed an appreciation for the trial process and said her decision would be based on the evidence presented to her, not what someone else reports. When defense counsel asked whether she could afford Hubers a presumption of innocence, she readily said, "Sure, I think everyone's entitled to that."

Hubers moved to strike this juror for cause based on her seeming awareness of the prior conviction. The trial court denied the motion because Juror 302 indicated she would not give any weight to anything that happened in the first trial and she would be fair and impartial in listening to the evidence presented to her.

Ultimately, Juror 302 expressed more than once that she lacked confidence in saying whether Hubers was convicted during her first trial. She fully understood the difference in the information learned from media reports and the testimony that would be presented at trial. When prompted by both parties she indicated that the prior trial would have no bearing on her decision. Most importantly, Juror 302 stated that she would give Hubers the presumption of innocence and recognized that a juror has the duty to make an independent determination based on the facts presented. Nothing in the record provides a reasonable ground to disqualify Juror 302 and thus the trial court did not err in declining to strike her for cause.

28

### iv. Juror 261

Juror 261 had heard around the time that Poston was murdered that his ex-girlfriend was a suspect. Additionally, he learned from the previous day's news that the jury was being selected, but he repeatedly stated that he had not paid much attention to the case. He said he normally watches the news for the weather and sports information, but other unrelated information comes up from time to time. The news reporter displayed a photo of the local court house and announced that jury selection in the case was starting the next day. Because Juror 261 was summoned for jury duty, he paid more attention to the announcement than he might typically. However, the news announcement did not discuss any prior proceedings in the case and gave no details about the retrial.

Juror 261 stated he knew that the case was being retried because someone on the prior jury was a felon, and that Hubers was convicted at the previous trial. However, he believed he could follow the court's instructions and only consider what the court told him to base his decision on. He said he did not have any opinion about Hubers, that he could be fair and impartial and that his prior knowledge would not affect him in any way because he would only listen to evidence heard in the courtroom. He specifically stated he would "blank out" what he had heard before and would base his decision on what is presented in court. When asked what percentage of his decision would be allocated to his knowledge of the prior trial, Juror 261 stated that his decision would be 100% based on what he heard during the upcoming proceedings.

Defense counsel asked the juror to consider a situation in which he was deliberating, and it was a close call. With that premise, defense counsel asked whether his knowledge that a prior jury found Hubers guilty would push him toward a conviction. Juror 261 responded, "I know that I could base it just on what I hear in that courtroom." He understood that his task as a juror would be to listen and base his decision solely on the information presented at trial. Juror 261 expressed his understanding that everyone is presumed innocent until proven guilty and added that Hubers was found guilty by people other than the jury that would now sit on the case. Not knowing what evidence was presented during the first trial, he reiterated that the prior jury's decision would not impact his decision, and he would listen to what both sides presented. Finally, he concluded that he had no hesitation about rendering a decision, believed that the parties would want a juror with his frame of mind, and insisted that he could give "fair and impartial judgment no matter what." The trial court denied Hubers's motion to strike Juror 261 for cause.

While Juror 261 knew about the prior conviction, he expressed multiple times, and in more than one way, that he would base his decision only on what was presented in the court room. He also demonstrated an understanding that the evidence presented during the first trial might differ from the evidence presented on retrial. He did not hesitate in answering any questions and was confident in his ability to render a fair and impartial verdict. Juror 261 could separate any knowledge of the prior conviction from the present trial and follow the court's instructions and, in any event, his knowledge of the case was

30

minimal. Nothing during *voir dire* provided a reasonable ground to believe that this juror could not render a fair and impartial verdict. The trial court did not abuse its discretion in refusing to strike Juror 261 for cause.

### v. Juror 330

Juror 330 believed that Hubers shot Poston five times and received a forty-year sentence at the first trial but was unsure if he was correct regarding her sentence. Soon afterward, he reiterated that because he heard the information on the television, he was "not positive that's exactly right." He believed Hubers was found guilty but added that the information was not from any "official" source, just information on the television. Juror 330 stated he did not believe the extra-judicial information would impact him, and he affirmed that he could set that information aside in rendering a verdict. He understood that Hubers was presumed innocent and that it was the Commonwealth's burden to prove her guilt. He had not followed the case and had not talked to anyone about it.

Defense counsel asked Juror 330 whether he would hesitate to vote "not guilty" knowing a prior jury found her guilty. He stated that if the evidence supported "not guilty" he would have no hesitation voting that way, insisting that he would not give any weight to the prior verdict and that he could be fair and impartial to all parties. He also denied that the previous verdict would give him comfort if he decided to vote guilty or that it would affect him in any way. He stated that he would want to "feel like [he's] doing the right thing" regarding his vote and said: "if the evidence shows that she's innocent, you know, and I

31

feel that she's innocent, well, that'd make me vote innocent and that'd make me feel, well, I'd feel good about it." He said he would not share his extra-judicial knowledge with any other jurors. When the trial court asked if Juror 330 knew of any reason he could not render a fair and impartial verdict after listening to the evidence and the instructions, he did not.

The trial court properly denied the motion to strike Juror 330 for cause. This juror repeatedly indicated that he was unsure of the accuracy of the knowledge he had about the prior trial and conviction, and regardless he insisted that he could set that knowledge aside. Juror 330 expressed skepticism in relying on media reports in general and said his knowledge would not impact or affect him. Additionally, his answer to defense counsel's hypothetical revealed that he would vote based on the evidence, not according to what the prior jury did. Even though he knew of the prior conviction, this knowledge was insufficient to require disqualification because Juror 330's responses demonstrated no possibility of bias.

Finally, Hubers also argues generally that the trial court was "unpredictable" in excluding jurors with prior knowledge of the case. Hubers identifies fifteen other jurors who were removed for cause because they knew about the prior conviction, the previous sentence, the fact of a retrial, or because they did not follow the trial court's order to not research the case. However, many of those jurors expressed hesitation in answering questions regarding how their prior knowledge would impact their deliberations. Some could not provide Hubers the presumption of innocence based on what they

32

knew. These jurors also variously indicated that they would give weight to the prior conviction, had already formed opinions about Hubers, and would be generally uncomfortable in the decision-making process. In short, they are distinguishable from the specific jurors discussed, *supra.*

For example, Hubers specifically identifies Juror 30, who expressed knowledge of the prior conviction and who the trial court struck for cause, noting that it did not want Hubers to have to use a peremptory strike to remove him. This juror's knowledge and demeanor differed noticeably from the jurors discussed above. He was hesitant in his responses and made comments like "that's a hard question to answer." Juror 30 also said "from what I heard, it sounded like she was guilty," and that he has carried any impression he has about the case with him since the last trial. Twice he said, "I believe I could be fair . . . now if you all think I can't . . .," referring to the attorneys and trial court. Simply put, this juror's equivocation was obvious and concerning, and his *voir dire* illustrates why deference is given to the trial court, which is in the best position to judge a prospective juror's demeanor and responses.

Another juror Hubers focuses on, Juror 85, was removed because she knew about the prior verdict and for other reasons. Even though she said at one point she could give zero weight to the prior verdict, she later said she "probably wouldn't" give the prior verdict weight, and even later said, "I don't think I would give the prior verdict any consideration." She was hesitant in her responses. Moreover, this juror stated she had heard about the case on the radio and television news, had researched the case on the internet, and had

33

talked about the case with a friend. This is plainly more exposure than that of the jurors Hubers now complains about, because those jurors primarily knew something about the case from one source, not three, and they had not discussed the case with other people. Although Hubers has compared these fifteen jurors to the jurors she specifically complains about now, the trial court appropriately excused the identified fifteen jurors because their responses gave more cause for concern, constituting reasonable grounds to believe they could not render a fair and impartial verdict.

## B. The trial court did not abuse its discretion in refusing to strike Juror 173 for cause.

During general *voir dire,* Juror 173 initially indicated that if seated as a juror she would think about Hubers's potential decision not to testify. The conversation between the trial court, counsel and Juror 173 occurred at the bench and is difficult to hear at times. She stated that if she were in Hubers's shoes, she would testify and that she would "want to hear from [Hubers]." Defense counsel posed a hypothetical in which Hubers chose not to testify and Juror 173 said she would not change her vote based on that decision but would think about the fact that Hubers chose not to testify. Then defense counsel told her the judge would give her instructions at the end of the case, "but regardless of that, "that's [(Hubers's choice not to testify)]" something you're going to be thinking about?" and Juror 173 said, "yes." When asked whether she could put it aside if the trial court instructed her not to think about it, she said she would be able to set it aside and would not hold it against Hubers. Juror 173 then clarified that just because she might think

34

about it, that did not mean that it would influence her decision. Juror 173 reiterated that she "would not hold it against [Hubers]," and that she would be able to listen to the trial court's instructions and base her decision on those instructions, not her own beliefs.

Hubers argues the trial court erred in not removing this juror for cause, citing *Hayes v. Commonwealth*, 175 S.W.3d 574 (Ky. 2005). In *Hayes,* this Court held the refusal to excuse a juror "who would be prejudiced against the defendant because [she] did not testify in [her] own behalf" was reversible error. *Id.* at 584. The Court stated that defendants are entitled to exercise their Fifth Amendment right not to testify and are entitled to have jurors who will not be prejudiced against the exercise of that privilege. *Id.* at 585. Hubers argues that, regardless of Juror 173's belief that she could "file away" her concerns, her reservations about Hubers's privilege not to testify constituted clearly reasonable grounds to strike her for cause.

This juror's statement about wanting to "hear from" Hubers and her admission that she would "think about" Hubers's hypothetical choice not to testify were insufficient to warrant removal when considering the totality of her responses. Ultimately, she stated she would not hold a decision to not testify against Hubers. Additionally, when the Commonwealth asked her if she could put the thought aside if the court instructed her to do so she affirmed she could put her thought aside.

In *Hilton,* 539 S.W.3d at 12, a juror "noted that if the Commonwealth proved its case beyond a reasonable doubt she would probably need to hear

35

something at trial from Hilton." The trial court then explained that Hilton had a constitutional right not to testify, and that such a decision could not be held against him. *Id.* at 13. After this explanation, the juror said she would have no problem following an instruction that set forth that right. *Id.* On appeal, Hilton argued that this juror should have been removed for cause and this Court explained that when the juror initially stated she would want to "hear from" the defendant, the juror "did not have the benefit of the trial court's guidance on the law concerning Hilton's right not to testify before being questioned about that topic." *Id.*

Here, during the bench conference, no one explained to the juror that Hubers had the right to not testify. However, when the Commonwealth asked Juror 173 if she could put any thoughts regarding Hubers's choice to testify aside if instructed to do so, she did not hesitate in stating, "Yes, I would be able to set it aside." Although Juror 173 apparently did not have the benefit of the trial court's guidance regarding Hubers's Fifth Amendment right to not testify, the juror clearly indicated that she could follow the court's instructions. The trial court did not abuse its discretion in declining to strike her for cause.

II.    **The trial court did not abuse its discretion in refusing a change of venue.**

Hubers contends that the trial court erred by not granting her motion for a change of venue. Prior to trial, Hubers filed several motions requesting a change of venue from Campbell County and the surrounding counties in the greater Cincinnati media market, and particularly requesting that the trial be moved to Harrison County. She argued that the prejudicial media coverage of

36

her case made it reasonably likely that she could not receive a fair trial in Campbell County. In addition to local news stations, the case was also covered by several national news organizations, including ABC News, CBS News, and CNN. Although Hubers's case received a substantial amount of publicity, we find no error in the trial court's refusal to change venue.

In support of the motion, defense counsel attached seventy-six affidavits from citizens in Campbell County and surrounding counties to show the effect reporting of the case had on the local community. Hubers argued that the prejudice to her right to a fair trial should be presumed in these circumstances, citing *Gill v. Commonwealth,* 7 S.W.3d 365, 369-70 (Ky. 1999), which states that "in a truly exceptional case, the degree and the bias of pretrial publicity can be so great so that prejudice may be presumed."

Applying the factors delineated in *Skilling v. United States,* 561 U.S. 358 (2010), the trial court determined that this was not a "truly exceptional case" in which the pretrial publicity was so great that prejudice could be presumed. *Cf. Jacobs v. Commonwealth,* 870 S.W.2d 412, 416-17 (Ky. 1994) (pretrial publicity resulted in all members of the petit jury having "almost alarming" knowledge of the case prior to being seated). In *Skilling,* the United States Supreme Court identified several factors relevant to the analysis of presumed prejudice due to pretrial publicity: (1) the size and characteristics of the community in which the crime occurred; (2) the nature of the news stories; (3) the timing of the trial in relation to the alleged crime; and (4) whether the jury acquits the defendant of some of the alleged crimes, a factor not applicable to Hubers's case.

37

The trial court found that Campbell County, with a population of approximately 92,211 people, was of "such size" that they should to able to seat twelve jurors and two alternates, and that much of the media coverage regarding the case occurred several years earlier, between 2012 and 2015. The trial court opined that the media coverage was extensive and some of it was unflattering to Hubers, but "none of the coverage is so blatantly prejudicial so as not to expect a juror to shut it out." Additionally, a significant period of time had lapsed – the most detailed coverage occurred between 2012 and 2015, and the second trial was scheduled to begin on April 3, 2018.[12] The trial court found no actual prejudice stemming from the extensive media coverage and that *voir dire* would reveal any juror preconceptions regarding the case.

As a result of the trial court's order denying a change of venue, Hubers moved to conduct individual *voir dire* on the issue of pretrial publicity, to send the jury venire a pretrial questionnaire regarding publicity, and to be allowed additional peremptory strikes. On May 1, 2018, the trial court granted the motions for individual *voir dire* and use of a jury questionnaire but denied the request for additional peremptory strikes. As mentioned, included with the detailed questionnaire mailed to prospective jurors was a letter admonishing them not to research or listen to any news pertaining to the case.

In our view, the trial court took appropriate and significant measures to ensure the impaneling of a fair and impartial jury. The questionnaire, drafted

---

[12] The retrial was rescheduled and did not actually occur until August 2018.

by and agreed upon by the parties, was mailed to potential jurors in an effort to determine in advance of the trial what knowledge they possessed about the case and whether they had formed any opinions.[13] As noted *supra,* after receiving the returned questionnaires, the Commonwealth and Hubers agreed to strike sixty-one potential jurors for cause.

Ultimately, the trial court and the parties conducted approximately fifteen hours of individual *voir dire* with eighty-two potential jurors. This individual questioning occurred in the judge's chambers, and each party was given the opportunity to question each potential juror extensively to ascertain what knowledge they possessed and whether they could be a fair and impartial juror. Additionally, the trial court often posed its own questions to the potential jurors. After individual *voir dire,* the trial court and the parties conducted general *voir dire.*

On August 13, 2018, Hubers renewed her motion for a change of venue, noting that there were still ten jurors on the venire panel who had knowledge of her prior conviction. The Commonwealth pointed out that more than sixty potential jurors remained, which is the number normally called for a felony case. The Commonwealth also noted that they needed enough jurors to seat

---

[13] According to Hubers's July 10, 2018 motion filed under seal, out of 213 returned questionnaires, 142 potential jurors stated they had some knowledge of the case. Seventy-two potential jurors had formed some opinion about the case, so it follows that 141 jurors had not formed an opinion about the case. Additionally, fifty potential jurors believed Hubers was guilty. We note that none of the jurors who responded to the questionnaire stating they had either formed an opinion about the case or believed Hubers was guilty advanced past individual *voir dire* during the jury selection process.

39

fourteen and to allow each side to exercise their nine peremptory strikes, for a total of thirty-two jurors. Reasoning that there were sufficient jurors in the panel to proceed with selecting a jury in Campbell County, the trial court again denied the motion. Hubers continues to insist that the trial court abused its discretion in denying her motion for change of venue.

Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, a change of venue must be granted when "it appears that the defendant cannot have a fair trial in the county wherein the prosecution is pending." *Sluss v. Commonwealth*, 450 S.W.3d 279, 285 (Ky. 2014) (quoting *Brewster v. Commonwealth*, 568 S.W.2d 232, 235 (Ky. 1978), *overruled on other grounds by Floyd v. Neal*, 590 S.W.3d 245 (Ky. 2019). Statutorily, Kentucky Revised Statute (KRS) 452.210 permits a change of venue when the presiding judge is satisfied that "the defendant or the state cannot have a fair trial in the county where the prosecution is pending." "In considering a motion for change of venue, the trial court is vested with 'wide discretion,' and its decision will not be overturned absent an abuse of discretion." *Hilton*, 539 S.W.3d at 7 (citations omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted).

Hubers essentially asked the trial court to conclude that bias should be presumed given the volume of articles published about her case. However, "[i]t is not the amount of publicity which determines that venue should be changed;

40

it is whether public opinion is so aroused as to preclude a fair trial."

*Kordenbrock v. Commonwealth*, 700 S.W.2d 384, 387 (Ky. 1985). As this Court and others have often acknowledged, the trial court is in the best position to determine whether public opinion is aroused by the publicity because the trial court is familiar with the area in which the trial is to take place.

> Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror.

*Mu'Min v. Virginia,* 500 U.S. 415, 427 (1991). *See also Montgomery v. Commonwealth*, 819 S.W.2d 713, 716 (Ky. 1991) ("We have long adhered to the view that we should respect the trial judge's discretion in deciding whether pretrial publicity requires a change of venue because he is present in the county and presumed to know the situation.").

Kentucky precedent supports the trial court's decision to refuse a change of venue in this case. In *Wood*, 178 S.W.3d at 500, a defendant moved to change venue because ninety-five percent of the jury pool had been exposed to pretrial publicity. Wood committed his crimes in the middle of the day on a busy street in Glasgow, Kentucky, with more than twelve eyewitnesses and, as expected, the news coverage was extensive. *Id.* Nevertheless, this Court held that the trial court did not abuse its discretion in refusing to change the venue of the trial. *Id.* The trial court conducted general *voir dire* with 226 people and fifty of those people were qualified and questioned further. *Id.* Any potential

41

jurors who had formed an opinion as to Wood's guilt or innocence and any jurors with high exposure to the media reports were excused. *Id.* In light of the court's deliberate and responsible approach to impaneling the jury, reversal was not required. *Id.*

Similarly, in *Hilton,* 539 S.W.3d at 7-8, the defendant argued that he was denied a fair trial because "of the thirty-six jurors initially called for service, thirty-two responded that they heard some media coverage of the case." This Court held that Hilton's argument was insufficient to justify a change of venue because "the mere fact that jurors may have heard, talked, or read about a case is not sufficient to sustain a motion for change of venue, absent a showing that there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant." *Id.* at 8, (quoting *Brewster,* 568 S.W.2d at 235). The Court reasoned that the trial court carefully examined the potential jurors about their knowledge due to pretrial media coverage. *Id.* "To ensure Hilton's right to a fair jury, the trial court removed those jurors who had formed an opinion based on media coverage." *Id.*

As in *Hilton* and *Wood,* the trial court in this case carefully examined each juror to determine the extent of their knowledge based on pretrial publicity and removed any juror who had formed an opinion based on that knowledge. Our precedent appropriately reflects that focusing on the number of jurors who have been exposed to some form of pretrial publicity about the case is not the relevant inquiry in a change of venue analysis. Instead, the trial

42

court is tasked with determining whether the defendant can have a fair trial. Here, the trial court engaged in that painstaking process and correctly determined that Hubers could receive a fair trial in Campbell County.

Notably, the trial court relied in part on the time that had passed between the crime and the second trial. Hubers killed Poston on October 12, 2012. According to the trial court (a finding that has not been challenged), the most extensive news coverage occurred between 2012 and 2015.[14] The second trial began on August 8, 2018. "[I]t is clear that the passage of time between a first and a second trial can be a highly relevant fact." *Patton v. Yount*, 467 U.S. 1025, 1035 (1984). As we noted in *Southworth v. Commonwealth*, 435 S.W.3d 32, 55 (Ky. 2014): "A change-of-venue decision is a product of its time. . . . The passage of time since the [first] trial and initial coverage may have reduced the effect of any pre-trial publicity so that a fair jury could be seated upon retrial." Here, the five and one-half years between the crime and the retrial (and over three years between the trials) further supports the Campbell Circuit Court's decision to deny the change of venue motion.

In pressing her pretrial publicity claim, Hubers specifically notes that the video recording of her interview with police right after she shot Poston was

_____

[14] Hubers filed a renewed motion for change of venue on July 10, 2018, and stated that since the previous motion for change of venue was submitted, the media had continued to cover her case extensively. Hubers attached copies of the news articles. Interestingly, of the twenty-one attached news articles dated between February and June 2018, twelve of them related to Hubers's marriage while incarcerated. The articles also discussed the upcoming retrial, and many mentioned her prior conviction. While Hubers may not have anticipated news coverage of her marriage, in any event, that publicity was a result of her own action and is entitled to little weight when determining whether the news coverage was extensive.

43

shared on social media, played on local news stations, and "became viral." The video was available 24/7 via various news outlets, meaning exposure to the video and coverage of the first conviction was widespread in the community. In addition, there were local news updates throughout the first trial and video from that trial was used to produce episodes of crime shows like *20/20* and *Dateline,* which aired nationally. Obviously, access to social media and the internet is increasingly widespread but the fact that news about Hubers's first trial was covered by national markets and spread on social media does not support a change of venue. These channels, shows and various social media certainly are not confined to Campbell County, meaning people across Kentucky, indeed the entire country, were potentially exposed to information about Hubers's case. This inescapable fact simply underscores that the degree and extent of pretrial publicity is not the proper basis in deciding whether to grant a change of venue.

"In cases alleged to be affected by prejudicial news coverage, such as this one, the defendant must show 'that (1) there has been prejudicial news coverage, (2) it occurred prior to trial, and (3) the effect of such news coverage is reasonably likely to prevent a fair trial.'" *Sluss*, 450 S.W.3d at 285–86 (citations omitted). Hubers's argument fails to satisfy the third prong. She insists that "[t]here is an 'implied bias' . . . where a vast number of jurors are struck for cause and a majority of those remaining have had wide exposure to the case." *Id.* at 283. However, her argument ignores that the trial court specifically and carefully questioned potential jurors to ensure that none of

44

them were impermissibly affected by pretrial publicity. After a detailed questionnaire, individual *voir dire,* general *voir dire,* and striking numerous jurors for cause, the trial court was left with over sixty potential jurors who, at most, knew minimal details about the case. Based on the extensive procedures employed by the trial court, we cannot say that the effect of the news coverage, most of it over three years prior to the retrial, was "reasonably likely to prevent a fair trial." *Sluss,* 450 S.W.3d at 286.

Finally, as experienced jurists and trial lawyers alike well know, the most efficient and effective way to ascertain whether the community is impermissibly tainted by pretrial publicity is to attempt to seat a jury. Here the trial court did just that and its efforts were successful. Through the pretrial questionnaire and individual and general *voir dire,* the court and counsel questioned, identified and seated a group of fair and impartial jurors. The trial court did not err in denying Hubers's motions for change of venue.

### III. The trial court did not abuse its discretion in allowing testimony regarding Hubers's lack of remorse.

On August 7, 2018, one day before the trial began, Hubers filed a motion to prevent the Commonwealth from introducing evidence that she showed no remorse following Poston's death. Hubers stated that at the last trial the Commonwealth called "jailhouse snitches" to testify that Hubers demonstrated a lack of remorse while incarcerated with them at the Campbell County Detention Center. Hubers challenged the admissibility of such evidence under KRE 401, 402 and 404. Her counsel also claimed the Commonwealth did not provide proper notice under KRE 404(c) of its intent to introduce the evidence.

45

In response to the motion, the Commonwealth argued that Hubers's lack of remorse was relevant because it proved that the murder was intentional as opposed to an act of self-defense. The trial court allowed the parties to brief the issue and determined that the evidence, depending on what form it actually took at trial, was potentially admissible. Having concluded that the evidence fit into KRE 404(b) as an "other" act, the trial court held it could be offered to prove intent. Additionally, the trial court determined the evidence was relevant under KRE 401 because evidence regarding a lack of remorse tended to make Hubers's intent to commit murder more probable. The trial court noted that while the Commonwealth did not provide notice that strictly complied with KRE 404(c), any deficiency in notice was remedied by the parties' opportunity to brief the issue to the court and, in any event, Hubers was not prejudiced by a lack of notice. Ultimately, two women who were incarcerated with Hubers, Dooley and Miller, testified as to Hubers's statements about Poston's murder. They also testified that she lacked any remorse.

Turning first to the evidence rule relied upon by the trial court, KRE 404(b) states:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

46

KRE 404(c) requires that if the prosecution intends to introduce evidence pursuant to KRE 404(b), it "shall give reasonable pretrial notice to the defendant of its intention to offer such evidence." We review a trial court's evidentiary determination for an abuse of discretion, *Benjamin v. Commonwealth,* 266 S.W.3d 775, 791 (Ky. 2008), reversing a trial court's determination if it is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

Initially, we question whether KRE 404(b) is even applicable to this testimony. Hubers's seeming lack of remorse does not constitute a crime, wrong, or act under the rule. A lack of remorse is not really an "act," but more akin to a state of mind or demeanor and, at least in this case, the evidence was offered through the testimony of witnesses who observed the defendant's demeanor as she recounted what had occurred.

Even if evidence of lack of remorse could be construed as a KRE 404(b) act, Hubers had ample notice that the Commonwealth would likely introduce this evidence. In mid-2016, after the first trial but before the granting of a new trial, Hubers filed an appellate brief with this Court wherein counsel acknowledged that "[a]t least three [fellow inmates], as lay witness psychologists, testified at trial that Hubers showed no remorse while incarcerated . . . ." Further, just before the retrial began Hubers filed a motion *in limine* to prevent the Commonwealth from introducing any evidence regarding her lack of remorse. As the trial court properly concluded, Hubers

had sufficient notice of the evidence, an opportunity to challenge it pretrial and suffered no prejudice.

As to its admissibility, this testimony was relevant pursuant to KRE 401 and 402. "Evidence which is not relevant is not admissible." KRE 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Evidence is relevant in a criminal case if it tends to prove or disprove an element of the offense. *Little v. Commonwealth*, 272 S.W.3d 180, 187 (Ky. 2008) (citing *Harris v. Commonwealth,* 134 S.W.3d 603, 607 (Ky. 2004)). The evidence that Hubers demonstrated a lack of remorse when discussing the shooting was relevant to whether Hubers intended to kill Poston. A lack of remorse provides insight about a defendant's mental state and is particularly relevant here because Hubers claimed that she shot Poston in self-defense.

In *Sanders v. Commonwealth,* 801 S.W.2d 665, 677 (Ky. 1990), the Commonwealth introduced testimony of a state psychiatrist who evaluated Sanders. When asked whether she observed "any efforts by the patient to manipulate the people working with him," the psychiatrist stated that a chaplain commented that the patient "did not appear to have a true remorse." *Id.* Sanders argued that remorse was irrelevant to his guilt or innocence, but the Court reasoned that:

> [W]hile the subject of the defendant's remorse, in isolation, may well be irrelevant to the question of guilt or innocence, the record indicates that the question of remorse in the context presented was relevant to the psychiatrist's conclusion that the defendant is a

48

manipulative type of person, which question in turn is clearly relevant to a determination of whether the patient in fact suffered from a mental disease or defect, or whether on the other hand he was a malingerer. This latter issue being crucial in the guilt/innocence phase of trial, the evidence as to the defendant's remorse, *vel non,* was relevant and admissible.

*Id.* at 678.

Just as the evidence of remorse was relevant to the defendant's mental state in *Sanders,* we likewise find that evidence regarding lack of remorse was relevant to Hubers's state of mind, *i.e.,* whether she intended to kill Poston or was compelled to act in self-defense.

Hubers contends that even if the lack of remorse evidence was relevant to whether she intended to kill Poston, its probative value was outweighed by undue prejudice under KRE 403. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice . . . ." KRE 403. "A proper balancing under KRE 403 requires that a trial court consider three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth." *Yates v. Commonwealth,* 430 S.W.3d 883, 897 (Ky. 2014) (citing *Barnett v. Commonwealth,* 979 S.W.2d 98, 100 (Ky.1998)).

"Intent" is an essential element of murder, and the lack of remorse evidence was probative of Hubers's intent. "KRE 403 does not offer protections against evidence that is merely prejudicial, in the sense of being detrimental to a party's case." *Webb v. Commonwealth,* 387 S.W.3d 319, 328 (Ky. 2012)

(citations omitted). "Evidence is only unfairly or unduly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *Id.* (citations omitted). Here, the "no remorse" evidence was against Hubers's interest, but it was not unduly prejudicial. The two witnesses, Dooley and Miller, each made one reference to Hubers's lack of remorse and considering the totality of their respective testimonies, the lack of remorse comment was probably the least incriminating statement each witness made. As even Hubers admits, the jury had sufficient evidence from which it could draw reasonable inferences in deciding whether Hubers shot Poston intentionally or in self-defense. The isolated statements regarding a perceived lack of remorse, although relevant, added little to the overall evidence and were not unduly prejudicial. The trial court did not abuse its discretion in allowing this evidence.

## IV. The trial court did not abuse its discretion in disallowing two defense exhibits.

Chief Birkenhauer examined both Hubers's and Poston's phone and Facebook accounts as part of his investigation. Prior to his cross-examination at trial, the parties met with the trial court in chambers to discuss various text messages exchanged between Hubers and Poston so the trial court could determine, preliminarily, whether the exhibits would be admissible. Hubers

argues that the trial court erred in excluding two proffered defense exhibits – 48 and 52.[15]

Exhibit 48 was a text message from Poston to Hubers likely sent in September 2011[16] which stated, "Women are violated and men do the violating . . . it is different psychologically, women get used and men do the using."[17] During the hearing the Commonwealth argued the text message was hearsay that did not qualify for a hearsay exception and irrelevant to Poston's then-existing state of mind. The Commonwealth added that if the defense sought to introduce the text message for its effect on Hubers, the exhibit needed to come in through her testimony. Defense counsel responded that this statement was non-hearsay and would be offered for its psychological effect on Hubers, the listener. The trial court determined that the message was too remote to elicit

---

[15] Hubers also argues that the trial court erred in excluding defense exhibits 71 and 72, which were text messages between Poston and Hubers regarding Poston's ex-girlfriend. In fact, these exhibits were actually elicited during Hubers's testimony at trial and admitted into evidence as Exhibits 93 and 94. Her argument as to these exhibits is thus moot.

[16] This exhibit is not in the record, and the parties never stated the exact date this message was sent, but defense counsel made a reference to "three months later." Defense counsel tried to admit this exhibit after the parties discussed Exhibit 47, *see* n.17, which was a text message dated June 1, 2011. Therefore, it appears that Exhibit 48 was a text message from around September 2011.

[17] In its brief the Commonwealth references another text message sent from Poston to Hubers that contains similar language and states, "Women are violated and men do the violating, it's different psychologically . . . you have control issues. It usually manifests more clearly by way of political persuasions. People who lean Democrat have security and control issues and typically can't get off in my experience." This text message was actually Exhibit 47, which the trial court also excluded, finding that it was too remote and irrelevant. Although the Commonwealth mistakes this text message for Exhibit 48, this has no bearing on the Court's resolution of this alleged error.

51

during Chief Birkenhauer's testimony but agreed to revisit the issue if another legal reason or theory was presented at trial.

Hubers also argues that the trial court erred by excluding Exhibit 52, which is another text message exchange between Hubers and Poston dated July 19, 2011. Hubers messaged Poston saying she had a bad day. When he asked what happened, she said she hates her mother and that her family is so screwed up. Poston responded that she should "get back at" her mother by having anal or oral sex with "some guy . . . that's a good plan."

The Commonwealth objected to the introduction of the exhibit, arguing that the messages were hearsay and did not qualify under any exception. The introduction of these messages, in the Commonwealth's view, would be an attempt to try to smear Poston with something that is irrelevant, and to bring in a defense about sexual misbehavior even though Poston was not referring to himself in the message. Hubers responded that the messages were not offered for their truth. Instead, the messages suggested the emotional torture she suffered at the hands of Poston because they were having an emotionally vulnerable conversation and he responded with lewd comments.

The Commonwealth countered that Hubers herself needed to testify to say whether the messages had any effect on her. The Commonwealth also pointed out that the message exchange includes things like "haha," "jk," and "lol," so Hubers and Poston may have been joking. Observing that if Hubers wanted to testify as to her state of mind she could, the Commonwealth insisted it was inappropriate to introduce the evidence through Chief Birkenhauer. The

52

trial court sustained the Commonwealth's objection and determined that the two messages could possibly be admitted another way, perhaps through Hubers's own testimony or medical testimony, but not through Birkenhauer. The trial court expressly noted that it would reconsider the admissibility of the evidence if presented another way.

Again, we review evidentiary issues for an abuse of discretion. *English,* 993 S.W.2d at 945. Notably, Hubers argued that the messages were offered to show the "effect on the listener." With that premise, no basis existed for the introduction of such evidence through Chief Birkenhauer, who was neither the listener nor speaker in the message exchange. The appropriate way to introduce these messages would be through Hubers herself. Alternatively, as the trial court suggested, perhaps the messages could have been introduced through some medical expert to discuss any psychological effects that her relationship with Poston had on her mental state. But introducing messages for the purpose of showing the effect they had on Hubers or to show the "emotional torture" she was subjected to by Poston through Chief Birkenhauer's testimony would be improper, and the trial court correctly so ruled.

In further support of her argument, Hubers points to Exhibit 45 containing text messages from April 17, 2011, regarding a violent sexual encounter between Poston and Hubers. Chief Birkenhauer testified that Hubers's relationship with Poston began with Facebook messages in 2011. The sexual encounter referenced in Exhibit 45 occurred shortly thereafter. Over

53

the Commonwealth's objection to hearsay and relevancy, the trial court admitted the exhibit, finding that the message "goes to the initial application (sic) of their dating relationship." Hubers argues that the trial court's refusal to admit the messages in Exhibits 48 and 52, sent a few months after the relationship began, was arbitrary and unreasonable in light of the fact the court admitted Exhibit 45. We disagree.

Chief Birkenhauer searched Hubers and Poston's phones during his investigation and discovered they met via Facebook after Poston sent Hubers a "friend request" on March 20, 2011. Therefore, it was proper to allow Birkenhauer to testify as to how the relationship began, information that was revealed through the search of the phones as well as Hubers's testimony. It was also proper to allow him to reference Exhibit 45 because the violent encounter referenced in those messages was close in time to when the relationship began. This message plainly differs from Exhibits 48 and 52 which Hubers sought to introduce for their psychological effect on her. The proper way to introduce that type of evidence was through Hubers, not Chief Birkenhauer.[18] The trial court did not abuse its discretion in disallowing Exhibits 48 and 52.

---

[18] Neither party indicates whether defense counsel sought to introduce the messages through Hubers's testimony, but our review of her testimony reveals no such effort.

## V. The trial court did not err in limiting the evidence of Poston's drug use.

Hubers next argues that the trial court erred by excluding evidence relating to Poston's drug use. Prior to trial, the Commonwealth filed a motion to prohibit the defense from presenting evidence of Poston's prescription drug use, except for the substances found in post-mortem blood and urine testing.[19] In response, defense counsel attempted to use Poston's own words to show why the evidence was necessary. Poston made various Facebook posts, sent Facebook messages[20] and sent Hubers personal text messages primarily between May and November 2011 about his alleged drug abuse.[21]

---

[19] The original motion, which the Commonwealth states was filed on or around July 2, 2018, is not in the record.

[20] On Facebook a user can either make a "post," which is visible to their friends (the other users they have connected with on the site) or the public, depending on a user's privacy settings, or directly message specific users. These direct messages are only visible to those in the conversation. Hubers's response to the motion *in limine* containing references to these quotes cites to "Discovery, Poston Facebook" so it is unclear whether these statements were made in posts or in messages.

[21] Those messages included:

I take Propecia to prevent hairloss, even though I have no indication that I'm going to lose my hair. I take Dextrostat20 every day to get me up. I take Xanax and Ambien every night to put me to sleep. Acutane for the acne and Lexapro for depression[.]

I'm highly medicated – uppers and downers, story of my life can't sleep without Xanax and ambien and can't get anything accomplished without [sic] amphetamines – my body basically doesn't recognize cycles of "active" and "inactive"

[A]dmittedly I owe a lot to the uppers and downers – I never could have made it through law school and built my lawfirm [sic] without them but at about 8:00 every night I feel like impaling my forehead on a spike

I took two of those Accutane yesterday and today I can't move. Looks like one a day is my limit. Ugh I feel like death.

I think that my brain lesions have definitely effected [sic] my cognitive function, which pisses me off . . . the copious amounts of Xanax I ingest can't help either.

I never have enough ambien to make it a month.

In response to the motion *in limine,* Hubers argued that Poston's drug use played a significant role in his relationship with her. Poston told a friend via Facebook that "[I]'ve taken notice that the only time [I]'ve ever entered into relationships is when [I]'m taking anti-depressants . . . and that when I go off of them, even if I was in the middle of the relationship, [I] will soon change mind about wanting to be in the relationship." According to Hubers, Poston had a clear pattern of withdrawal when he took Dextrostat.[22] He often told her that he could not talk on the phone or see her at the end of the day due to how he

I think I took 5 dextrostats today . . . I definitely took too much . . .

I'm about to finish off some Johnnie Walker and go to bed 3 xanax and two ambien later I really should be asleeo [sic]

Not only can I not entirely wake up – I can't sleep either . . . last night I took 3 ambien, 3 xanax, a klonopin, and eventually a shot of vodka – I laid down to sleep at 12:00 and estimate I finally fell asleep at 4:30 I was honestly concerned that I was going to kill myself, but I had to be in court at 9:00.

taking aderall to get shit done everyday is fucking killing me though I hate that shit. Extreme irritability/depressed

It gets to the point that I'm literally just walking around growling at people.

and Vyvanse/Adderall turns me into a hyperproductive little napoleon for about a week, then it loses that effect and just makes me super irritable

[S]o [I]'m taking two things that increase dopamine and norepinephrine . . . unfortunately that means I feel like I might stab someone if they look at me crossways

the stuff they put me on fills me with rage from what I can tell

I'm taking new medication and I'm in a VERY bad mood. The first week you feel like you could take over the world and if you could maintain that effectiveness of the drug I probably would have by now[.] of course you crash every night as well . . . definitely not good.

[22] Dextrostat, also known as Dextroamphetamine, is a stimulant used to treat attention deficit hyperactivity disorder (ADHD) which helps increase a person's ability to pay attention and focus. It can also be used to treat narcolepsy by helping a person stay awake during the day. *Dextroamphetamine (Oral Route),* MAYO CLINIC (August 1, 2020) https://www.mayoclinic.org/drugs-supplements/dextroamphetamine-oral-route/description/drg-20071795.

felt from the drugs: "By the end of the day I'm so miserable from the amphetamines that I can't talk on the phone." Also, Hubers would often check with Poston to determine how his drugs were making him feel on a particular day before she decided whether to visit him.

Hubers argued that the evidence regarding Poston's drug use was highly relevant to her defense. She insisted that for a jury to determine whether Hubers was entitled to use self-defense, they needed to see Poston as she saw him – a man who took medications that made him irritable and aggressive.

The trial court determined that Poston's drug use as revealed by his post-mortem blood and urine testing was relevant. However, while the Facebook posts and text messages were somewhat relevant, they were more prejudicial than probative and not subject to cross-examination. Significantly, the trial court stated that if a sufficient foundation was offered to show that Poston's drug use affected his behavior on the night of the offense or even the day before, it would reconsider the issue. Hubers does not cite any place in the record where she revisited this issue in an attempt to introduce the evidence.

To be admissible at trial, evidence must be relevant, KRE 401, 402, but even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice . . . ." KRE 403. We conclude the trial court properly weighed this evidence and adopted a balanced approach that gave the jury credible information about Poston's drug use but without the risk of unfair prejudice.

Again, Hubers' primary argument is that she acted in self-defense, which placed her state of mind at issue and entitled her to establish the basis for her fear of Poston. She insists the jury should have been allowed to consider what part her knowledge of Poston's drug use, including the types of drugs he used, played in her belief that she must defend herself.

In a somewhat similar case, *Moorman v. Commonwealth,* 325 S.W.3d 325, 332 (Ky. 2010), avowal testimony was presented that the murder victim frequently used drugs. This Court held that the trial court properly excluded the evidence. The evidence was only minimally relevant because the defendant admitted to stabbing the victim and the only true issue was whether the defendant was the aggressor or whether she acted in self-defense. *Id.* at 333. Toward that end, the trial court permitted evidence of the victim's drug use twenty-four hours prior to the murder and allowed the introduction of post-mortem blood and urine analysis which revealed the victim recently used cocaine and marijuana. *Id.* In addition, the defendant testified to the victim's heavy drug use. *Id.* On appeal, this Court concluded that additional testimony on the issue would have been cumulative, and therefore the trial court did not abuse its discretion in including evidence of the victim's prior drug use. *Id.*

Like the defendant in *Moorman,* Hubers admitted to shooting Poston and the primary issue was whether she shot him intentionally or in self-defense. The messages Hubers sought to introduce regarding Poston's drug use were sent as far back as seventeen months prior to his death, with the most recent

58

message being sent around seven months prior to his death.[23]  Most of the

messages were not even sent to Hubers, but rather were private conversations

Poston had with various acquaintances.  While the communications establish

Poston's prior drug use, they were too remote in time from October 12, 2012, to

be relevant.[24]

We acknowledge Hubers's argument that Poston's drug use could have

played a role in her perception — alleged fear — of him, but this particular

evidence was properly excluded.  Clearly evidence of a victim's drug use close

in time to a crime allegedly involving self-defense merits careful consideration

but evidence of drug use seven months prior to the victim's death lacks

probative value and is most likely unduly prejudicial.

In any event, the jury heard significant evidence regarding Poston's drug

use.  Poston's toxicology report was introduced into evidence and elicited

testimony indicated that Poston tested positive, post-mortem, for

benzodiazepine and amphetamine.  The Commonwealth also introduced

Hubers's statement to the police, during which she said that Poston took "a lot

of drugs" and that he was "whacked on drugs."  Additionally, Hubers elicited

testimony about Poston's prescription medications.  She testified that in the

early stages of their relationship Poston had an "Altoid box full of Xanax" and

---

[23] Some of the messages and posts originated from Facebook and the pleadings filed by the parties do not provide dates for the Facebook activity.  Poston's Facebook data was part of discovery but is not part of the record.  The Court relies on the parties' statements in providing the dates of the communications.

[24] The Commonwealth noted that several of the medications referenced in the messages were no longer prescribed to Poston at the time of his death.

that Poston's cousin told her that he "was a really good guy when he wasn't under the influence." Finally, Hubers introduced evidence that Poston had refilled a prescription for Dextrostat on the day of his death and from a bottle of ninety pills, only seventy-seven remained.

In *Moorman,* 325 S.W.3d at 333, the trial court admitted evidence of the victim's drug use twenty-four hours prior to the murder, post-mortem blood and urine test evidence that established the victim recently used cocaine and marijuana, and the defendant's testimony about the victim's heavy drug use. This Court held that given this drug use evidence, "[a]dditional testimony upon the issue would have amounted to a needless presentation of cumulative evidence." *Id.* (quoting KRE 403). The same can be said in this case because the additional text messages (distant in time and therefore questionably relevant in the first instance) would also have been cumulative. KRE 403. In sum, the trial court did not abuse its discretion in excluding messages and Facebook posts that were minimally relevant, cumulative and prejudicial.

## VI. The trial court did not err in admitting the testimony of Jay Poston.

Hubers argues that the trial court erred in allowing victim impact testimony from Jay Poston, Ryan Poston's father, during the guilt phase of trial. Prior to Jay's testimony, Peter Carter, Poston's step-father, testified that he had been in Poston's life since he was a year old. He stated that when Poston was in law school he changed his name to Ryan Carter Poston to reflect that he had two fathers who raised him. Carter also recounted conversations he had with Poston on the night before he was murdered about his relationship

with Hubers and his plans to go on a date with a woman he described as being "Miss Ohio" and beautiful. Poston told Carter he had tried everything to convince Hubers he was not interested in her. Defense counsel objected a few times throughout Carter's testimony, but the objections were based on hearsay not that Carter was offering victim impact testimony.

The next day, prior to Jay Poston's testimony, defense counsel made a general objection to victim impact testimony. Defense counsel referenced a large photo of Ryan Poston that the Commonwealth had prepared and had in the court room. The trial court took the general objection under advisement because Jay Poston had not yet testified, and it could not be sure what his testimony entailed. Defense counsel stated that counsel came close to objecting to Carter's testimony the day before but did not object because they recognized that the Commonwealth is entitled to present a certain amount of victim impact testimony. However, during the guilt phase such testimony cannot be introduced to arouse sympathy because it is irrelevant to the defendant's guilt or innocence.

Jay Poston testified that his son was his "world" and "beautiful like his Italian mother." Jay also stated that Poston was brilliant, had a kind heart, and would always kiss him and other family members, telling them he loved them before leaving them. He recounted a time where Poston asked him to take some of his shirts to the cleaners, and how that favor turned into Jay routinely doing Poston's laundry and cleaning his condominium. He stated that he went to the condominium approximately three times a week and that

61

Poston was "a bit of a slob" who did not really care what his residence looked like. Defense counsel objected when Jay began talking about Poston's dress shirts, and also when Jay said Poston was working very hard, but the grounds for the objections are unclear. Although the trial court sustained the objections, Jay continued the testimony he was giving at the time of the objections.

The Commonwealth argues that any objection to Carter's testimony is not preserved for review, and we agree. "Non-contemporaneous objections are insufficient for preservation under RCr 9.22." *Couch v. Commonwealth*, 256 S.W.3d 7, 10 (Ky. 2008). However, Hubers argues on appeal that Jay Poston's testimony was erroneously admitted, and she mentions Carter's testimony only to demonstrate how she believes the Commonwealth crossed the line from background information testimony into victim impact testimony.

As stated, Hubers objected to Jay Poston's testimony on victim impact grounds prior to the actual testimony and, for reasons that are unclear in the record, also objected during his testimony when Jay described laundering Ryan's shirts and Ryan working hard. Over the course of Jay Poston's testimony, defense counsel objected a few additional times on hearsay grounds, but never again raised an objection based on victim impact testimony. Therefore, it is questionable whether this alleged error is preserved for our review but, regardless, any error was harmless.

The primary purpose behind Jay Poston's testimony was to demonstrate that the condominium was always in disarray, even in the absence of any sort

62

of struggle between Poston and Hubers the night of the murder. The question Hubers raises on appeal is whether Jay Poston's testimony that his son was kind-hearted, beautiful, brilliant, and his "world" constitutes victim impact testimony as opposed to simply background evidence. As we have noted:

> A certain amount of background evidence regarding the victim is relevant to understanding the nature of the crime. The prosecution can introduce evidence in the guilt phase identifying a victim as a living person rather than a simple statistic.
>
> Although background evidence regarding the victim is relevant to understanding the nature of the crime, victim impact evidence differs from victim background evidence, in that the former is generally intended to arouse sympathy for the families of the victims, which, although relevant to the issue of penalty, is largely irrelevant to the issue of guilt or innocence. Such evidence does not unduly prejudice a defendant 'as long as the victim is not glorified or enlarged.

*Richmond v. Commonwealth,* 534 S.W.3d 228, 233 (Ky. 2017). It is not surprising that a victim's father would testify that his son was important to him or that he loved his child – that is simply human nature. Nor is it surprising that a father would describe his son as brilliant and kind-hearted. His testimony regarding his love and affection for his son reflected that status of their relationship. While Jay Poston's testimony does not squarely fit within the other types of background testimony this Court has considered in other cases, we do not believe it rises to the level of victim impact testimony that was intended to "arouse sympathy for the famil[y] of the victim[]." *Richmond,* 534 S.W.3d at 233.[25]

---

[25] *See Templeman v. Commonwealth*, 785 S.W.2d 259, 261 (Ky. 1990) (victim's wife testified they were married for thirty-five years and had five children and ten grandchildren); *McQueen v. Commonwealth*, 669 S.W.2d 519, 523 (Ky. 1984) (victim's

"The line between relevant-background information and prejudicial-impact testimony is a narrow one; but we essentially distinguish the two forms of testimony by inquiring whether the witness was overly emotional, condemnatory, or accusatory in nature." *Roe v. Commonwealth,* 493 S.W.3d 814, 824 (Ky. 2015). Here, Jay Poston's testimony was not emotional, condemnatory, or accusatory in any way. He remained composed and briefly spoke about his son to establish the relationship they shared, expressing a few of Poston's traits and his love for him.

Even if allowing this brief testimony was error, it was harmless error. RCr 9.24. "The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties." *Id.* A non-constitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error. *Winstead v. Commonwealth,* 283 S.W.3d 678, 688–89 (Ky. 2009) (citing *Kotteakos v. United States,* 328 U.S. 750 (1946)). We cannot say that the jury was swayed by these isolated comments in Jay Poston's brief testimony, which focused primarily on the condition of Poston's condominium, *i.e.,* his habitual sloppiness, a matter relevant to understanding the crime scene.

---

father testified that victim graduated from college and was working to pay for a master's program).

## VII. The trial court did not abuse its discretion in admitting the testimony of Audrey Bolte.

One of the Commonwealth's witnesses was Audrey Bolte, a woman who had scheduled a date with Poston for the night of October 12, 2012.[26]  Hubers objected to Bolte's testimony as irrelevant and continues to insist the trial court erred in allowing her to take the stand.  We find no error.

Bolte testified that she and Poston met on Facebook in January 2012.  In October 2012 they began a Facebook message conversation after Poston left a "funny and interesting" comment on one of Bolte's Facebook posts in which she asked for movie reviews.  Bolte thought Poston was funny and smart, classifying their conversations as light-hearted, funny banter.  Eventually they exchanged cell phone numbers and began exchanging text messages.  Through Bolte's testimony, the Commonwealth introduced text messages between Bolte and Poston from October 12, 2012.  The messages revealed that they arranged to meet and go to a low-key place to grab a drink.  The two originally planned to meet around 9:00 p.m., but she pushed their meeting time back to around 10:00 or 10:30 p.m. due to a family funeral.  After Bolte explained to Poston that the place was a dive bar, he asked, "So I should go home and change out of my suit first?"  She responded that he should change.  Although Hubers contended Bolte was irrelevant to the issues at trial, the Commonwealth introduced evidence of a photo of Audrey Bolte that was on Hubers's phone on

---

[26] References to Audrey Bolte, "Miss Ohio," occurred prior to her testimony. Peter Carter testified that Poston told him he had a date with a woman he described as "beautiful, tall, blonde and Miss Ohio."  Cicely Miller, a jailhouse informant, also testified that Hubers told her Poston had a date with a woman who was Miss Ohio.

65

October 10, 2012 and insisted Hubers's jealousy of Poston's interest in Bolte prompted the murder.

Hubers first argues that Bolte's testimony regarding a 10:30 p.m. date with Poston was not relevant to the Commonwealth's timeline. She points to the 911 call played for the jury, a call she made at 8:53 p.m. shortly after she shot Poston. She claims Bolte's testimony was irrelevant to whether Hubers shot Poston in self-defense and that Bolte knew nothing about Hubers's and Poston's relationship. Even if relevant, Hubers argues that the testimony was unduly prejudicial. Contrastingly, the Commonwealth argues that Bolte's testimony was highly relevant to the Commonwealth's theory of the case, which was essentially that Hubers shot Poston in a jealous rage after she learned that he had a date scheduled with Bolte that night.

Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. In a criminal case, evidence is relevant if it tends to prove or disprove an element of the offense. *Little*, 272 S.W.3d at 187 (citing *Harris,* 134 S.W.3d at 607). To satisfy the relevance requirement, evidence need only make a fact slightly more probable:

> An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable than not . . . . It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable.

66

*Harris,* 134 S.W.3d at 607 (citing *Turner v. Commonwealth,* 914 S.W.2d 343, 346 (Ky. 1996)). As with other evidentiary issues, we review for an abuse of discretion, determining whether "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945 (citations omitted).

We agree with the trial court that Bolte's testimony was relevant to the Commonwealth's case. The text messages regarding Poston and Bolte's plans to meet and Poston's intent to change out of his suit to go to the dive bar were exchanged hours before he was murdered. As the Commonwealth argued, changing clothes may have been the only reason why Poston returned to his condominium and encountered Hubers on the night he was murdered. Beyond the events of October 12, 2012, other evidence introduced by the Commonwealth established the relevancy of Bolte's testimony. Poston and Bolte became connected as "friends" on Facebook on January 27, 2012. Two days later, on January 29, 2012, Hubers searched for Bolte on Facebook. She searched for Bolte again in June 2012. At trial, Hubers testified she did not know Poston was meeting Bolte on October 12, 2012 (despite what she later told fellow inmates) and that she did not intentionally access the photo of Bolte that was found on her own phone.

Undoubtedly, Bolte's testimony was relevant to a potential motive for the crime given the Commonwealth's theory that Hubers shot Poston in a jealous rage after she learned that he had a date with Bolte. Evidence relevant to motive is often admitted in criminal cases. *See Springer v. Commonwealth,* 998

67

S.W.2d 439, 450 (Ky. 1999) (evidence that the defendant was romantically involved with a person is relevant to establish a motive to kill that person's spouse); *Adkins v. Commonwealth*, 96 S.W.3d 779, 793 (Ky. 2003) (evidence of a drug habit and insufficient funds to support that habit is relevant to show motive to commit a crime to get money to buy drugs). Bolte's testimony established that she and Poston had plans to meet on the night he was murdered, an important fact central to the Commonwealth's case. Her testimony at the very least made it slightly more probable that Poston's date with another woman impacted Hubers's intentional decision to shoot and kill him. Therefore, the trial court did not abuse its discretion in admitting Bolte's testimony.

**VIII. The trial court did not err in declaring Doris West unavailable pursuant to KRE 804(a)(4) and allowing her prior trial testimony to be played for the jury.**

Doris West, who lived in the condominium directly below Poston when he was murdered, testified at the first trial. She stated that she and her husband had lived in their condominium for about a year and a half before the murder and never heard much noise from Poston's condominium until the night of October 12, 2012. She testified that around 8:45 that night she heard a female crying on Poston's back deck. She heard the female get up from a chair because she could hear it scooting back. A few seconds later she heard two shots, a six-second break, then four more shots. She also heard a loud thump as if someone fell. Doris testified that she had never heard yelling or screaming from Poston's condominium before and did not hear yelling or screaming on

68

that night.  Doris also testified that she had heard a female crying on Poston's back deck the night before the murder.  Then a male voice said, "It's okay, it's okay."  As of April 16, 2015, the day she testified, she stated that she could hear some noises from the current tenant of Poston's condominium.

On August 4, 2018, the Commonwealth filed a motion to have Doris West deemed unavailable for the retrial pursuant to KRE 804(a)(3), which deems a declarant unavailable due to lack of memory, and KRE 804(a)(4), which deems a declarant unavailable due to death or existing physical or mental illness. Doris's sons, Gary and Dennis West, had previously contacted the Commonwealth to express their concerns about Doris testifying at trial. During a short hearing on August 15, 2018, the Commonwealth argued that Doris was unavailable because she had dementia and that the prosecution needed to present her video-taped testimony from the first trial in 2015 rather than call her as a witness and have to continually refresh her recollection.  In opposition, Hubers argued that Doris did not meet the criteria under KRE 804(a)(3) because she had some memory of the event, even though it was vague.

The trial court briefly addressed the issue at the end of that day, August 15, 2018, and determined that an evidentiary hearing was necessary.  During a hearing on August 16, 2018, Gary West testified that he reached out to the Commonwealth with his concerns about his mother testifying.  Gary said that he spent a lot of time with Doris and that she was very forgetful and had trouble recalling things.  He said Doris had not been evaluated because she

69

refuses and "gets mad." According to Gary, his brother, Dennis, was even more concerned about Doris's memory and her ability to testify. Gary testified that Doris said she did not want to testify at the trial because she forgets things and is unsure about what she would say. He gave as an example of Doris's condition her mistaken belief about who currently resides in the condominium above her. After Poston's death, a man named Smith moved in but he left and two college-aged girls were the current occupants. According to Gary, Doris pounded on their door to "warn" them about Smith, and any time she heard a noise she thought it was Smith. Additionally, Gary said his mother, who often made meatloaf, can no longer remember how to make one, and sometimes is unable to recognize her grandchildren or forgets their names. Gary testified that his mother's ability to recall events had deteriorated since 2015.[27]

Chief Birkenhauer also testified. After the Commonwealth learned of the family's concerns about Doris testifying, he visited the Wests at their home. He stated that Doris referred to 2012 as two years ago and expressed a vague memory of the events. She said if her memory was refreshed she may be able to remember, but "it's been two years, so I don't know." Doris was still convinced that Smith lived above her, even though Birkenhauer told her that he is currently in jail. Doris became agitated when Chief Birkenhauer explained Smith no longer lived there. Chief Birkenhauer testified that he had

_____

[27] In addition, Gary West testified that he and his siblings, Doris's other six children, recently met to discuss her mental condition and determine what course of action to take. Without Doris's knowledge, they scheduled an appointment for her to be evaluated in approximately two months from the date of the hearing.

70

to keep Doris on topic during their conversation and opined that Doris would be testifying primarily based on the reminders given to her on the stand.

The trial court determined that Doris was unavailable because of her mental infirmity pursuant to KRE 804(a)(4). Based on the evidence it heard regarding her condition, the trial court found that Doris would lack independent memory of the content of her prior testimony. Given that she testified at the first trial and Hubers's prior counsel had the opportunity to fully cross-examine her at that time, the trial court granted the Commonwealth's motion to play Doris West's previous trial testimony.

Prior to playing Doris's testimony, the Commonwealth stated that it "would like to play testimony given by Doris West at a prior hearing in this matter." The trial court explained to the jury that Doris testified under oath in a previous proceeding in this case and that she was unavailable to testify that day due to memory issues.

Hubers argues that the trial court did not follow the correct procedures in determining that Doris was unavailable. She contends that it was insufficient for Gary West and Chief Birkenhauer to testify that Doris lacks memory of the events and that instead Doris herself should have testified at the hearing. We find no violation of the applicable rule.

KRE 804(a)(3) and (4) provide:

(a) Definition of unavailability: 'Unavailability as a witness' includes situations in which the declarant:

(3) Testifies to a lack of memory of the subject matter of the declarant's statement;

71

(4) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity . . .

KRE 804(a)(3) governs a situation in which a witness attempts to testify but is unable to do so because of a lack of memory. Under this subsection, the witness must testify as to his or her inability to remember. However, KRE 804(a)(4) involves a different approach. Under this subsection, a potential witness does not have to come into court and personally testify as to his or her mental or physical infirmity in order to be declared unavailable. We review a trial court's decision regarding a witness's unavailability for an abuse of discretion. *Brooks v. Commonwealth,* 114 S.W.3d 818, 822 (Ky. 2003). "Such a decision is within the sound discretion of the trial judge . . . and [s]uch a determination will not be reviewed unless the decision of the trial judge is clearly unreasonable." *Id.* (citations omitted).

In *St. Clair v. Commonwealth,* 140 S.W.3d 510, 538 (Ky. 2004), a witness, who lived out of state, could not travel to Kentucky to testify at trial due to complications with her pregnancy. During the hearing on the Commonwealth's motion to take the witness's deposition to present at trial, the Commonwealth explained that the witness's attorney contacted them regarding her medical condition and that her doctor faxed a letter showing she was not medically able to travel. *Id.* at 539. The trial court granted the motion and the parties traveled to Oklahoma and deposed the witness. The Commonwealth used her testimony at trial to discredit the defendant's defense. *Id.*

72

On appeal, St. Clair argued that "the failure of the Commonwealth to produce any sworn testimony as to [the witness's] unavailability to testify at trial made the introduction of her deposition improper." *Id.* at 540. The Court concluded that although the Commonwealth could have made a "much cleaner record" by providing a letter from the witness's physician, filing an affidavit from the physician or prosecutor, or questioning the witness about her physician's orders during the deposition, the trial court did not abuse its discretion in finding the witness unavailable "on the basis of the Commonwealth's assurances." *Id.*

In *Brooks,* 114 S.W.3d at 821, the Commonwealth advised the trial court that an incarcerated witness had attempted suicide and would be unavailable to testify at trial. The Commonwealth sought to play the witness's testimony from an earlier trial, which ended in a mistrial. *Id.* Challenging whether the witness was legally unavailable, the defense counsel asserted that the Commonwealth was required to present physical evidence with regard to her illness. *Id.* In response, the Commonwealth presented a sworn affidavit from the prosecutor containing the information he obtained regarding the witness's condition and the phone numbers of officials at the prison to whom he spoke. *Id.* After the defense declined the opportunity to telephone the prison officials, the trial court phoned them in order to corroborate the affidavit and verify the witness's condition. *Id.*

On appeal, the Court determined that "[t]he trial judge properly exercised his sound discretion in determining that [the witness] was unavailable to

73

attend or testify because of sickness or infirmity pursuant to RCr 7.20(1)."[28]

*Id.* Where a witness is unavailable for health reasons,

> if the prior testimony is found by the trial court to be reliable and trustworthy, and the witness was subject to cross-examination, it makes no difference whether the prior testimony comes by way of deposition, previous trial, preliminary hearing, or as in the *Howard* case, a bond reduction hearing, provided the same offense and same charge are dealt with.

*Id.* at 822 (citing *Commonwealth v. Howard,* 665 S.W.2d 320 (Ky. App.1984)).

Although *St. Clair* and *Brooks* involve a witness's unavailability due to physical infirmity, the standards imposed for mental infirmity are the same. In both cases, the Commonwealth's assurances and a sworn statement from the prosecutor were sufficient for the trial court to declare a witness unavailable. In Hubers's case, the Commonwealth introduced the information it received from Doris's concerned family members and the trial court heard the sworn testimony of Gary West and Chief Birkenhauer, who personally visited Doris to ascertain the state of her memory. While neither of these individuals is a medical professional, Gary provided first-hand accounts of his mother's trouble in recalling basic things, like how to make a meatloaf and her grandchildren's names. In the brief time Chief Birkenhauer visited Doris, he personally witnessed her mental infirmity and agitation over memory issues.

---

[28] RCr 7.20(1) states that "[a]t the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used if it appears: . . . that the witness is unable to attend or testify because of sickness or infirmity . . . ."

74

The trial court did not err in declaring Doris West unavailable pursuant to KRE 804(a)(4). After considering the sworn testimony of two reliable witnesses, the court properly deemed her unavailable due to her dementia, a mental infirmity. It was unnecessary for Doris herself to testify before the court in order for KRE 804(a)(4) to apply. Importantly, her video testimony from the 2015 trial was played for the jury, allowing them to weigh her demeanor and credibility in a courtroom setting. *Parson v. Commonwealth*, 144 S.W.3d 775, 785 (Ky. 2004). At that earlier trial, Hubers's counsel was able to cross-examine Doris West with a judge present to address any objections or concerns, just as would have occurred for live trial testimony in 2018. *Id.* No error occurred in the handling of this testimony.

## IX. The cumulative error doctrine is inapplicable.

Finally, Hubers argues cumulative error, which is "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown,* 313 S.W.3d at 631. The only potential error we have identified was Jay Poston's guilt-phase testimony arguably crossing over into the realm of victim impact testimony, but to the extent that was error it was harmless. Consequently, the cumulative error doctrine does not apply.

## CONCLUSION

For the foregoing reasons, the judgment of the Campbell Circuit Court is affirmed.

All sitting. All concur.

75

COUNSEL FOR APPELLANT:

Julia Karol Pearson
Adam Meyer
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General